UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>JOHN WATSON, JR., )<br><br>Defendant. ) | Criminal No. 1:13-cr-00336 (TSE/IDD) |

## REPORT AND RECOMMENDATION

This matter is before the Court on the government's Motion to Involuntarily Medicate Defendant, John Watson, Jr., to Restore him to Competency. (Dkt. No. 24.) Arguments on the Motion were heard on July 2, 2013 and July 17, 2013, and briefs, as well as supplemental briefs, were filed by the parties. Pursuant to the Honorable United States District Judge T.S. Ellis, III's Order (Dkt. No. 56), the undersigned Magistrate Judge issues this Report and Recommendation. Upon carefully considering the record and all arguments presented, the undersigned recommends that the government's Motion to Involuntarily Medicate Defendant to Restore him to Competency be GRANTED.

## I.    INTRODUCTION

On September 30, 2012, the government filed a criminal complaint against Mr. John Watson, Jr. ("the defendant" or "Mr. Watson") charging him with assault and interference with a United States government employee while such employee is engaged in the performance of his official duties, 18 U.S.C. § 111(a)(1). (Dkt. No. 1.) On October 11, 2012, this Court held a hearing to determine the mental competency of the defendant. Upon consideration of a Competency Evaluation Report and the arguments of counsel during the hearing, this Court

determined that the defendant was suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. (Dkt. No. 14.). On June 7, 2013, the government filed the instant motion seeking the entry of an order that the defendant be involuntarily medicated to restore the defendant to competency in order to stand trial.

## II.    FINDINGS OF FACT

Upon full review of the Motion to Involuntarily Medicate Defendant, the oppositions and replies to the motion, the supplemental briefs, the record, and the arguments of counsel at the April 30, 2013, July 2, 2013 and July 17, 2013 hearings, the undersigned Magistrate Judge makes the following findings of fact.

### A. Incident

On September 28, 2012, nearby witnesses observed the defendant, John Watson, Jr., on a boat located at the far end of the dock at the Belle Haven Marina in Alexandria, Virginia.[1] (Dkt. No. 24 at 1.) At around 6:00 p.m. that evening, the witnesses heard gunshots and observed the defendant shooting from the USS America. (*Id.*) The defendant was observed shooting at a United States Coast Guard helicopter that was passing over the marina. (*Id.*) Three United States Coast Guard members were riding in the helicopter when the defendant fired at them. (*Id.*) The defendant was arrested later that evening, and on September 30, 2012, the government filed a criminal complaint against the defendant charging him with assault and interference with a United States government employee while such employee is engaged in the performance of his official duties under 18 U.S.C. § 111(a)(1). (Dkt. No. 1.)

---

[1] The Belle Haven Marina is located in Alexandria, Virginia, which is within the Eastern District of Virginia.

## B. Preliminary Evaluations

On October 7, 2012, Dr. Rebecca J. Peterson, a licensed clinical psychologist, submitted a *Competency to Stand Trial Evaluation Report* to the Court. (Dkt. No. 13.) In her report, she stated that

> "[at] this time, Mr. Watson appears to be experiencing delusions and auditory hallucinations. These symptoms are often successfully treated with antipsychotic medications and his symptoms would likely remit with psychiatric treatment. However, Mr. Watson stated that he is unwilling to take psychotropic medications and will likely refuse medications in a psychiatric setting."

(*Id.* at 5-6.)

Dr. Peterson concluded that, "it is [her] opinion within a reasonable degree of professional certainty, that [the defendant] Mr. Watson is currently unable to participate meaningfully and effectively in his defense." (*Id.* at 5.)

On October 11, 2012, this Court held a hearing pursuant to 18 U.S.C § 4241 to determine the mental competency of the defendant. Upon consideration of Dr. Peterson's competency evaluation report and the arguments of counsel during the hearing, this Court determined that the defendant was suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. (Dkt. No. 14.) In light of this finding, this Court ordered that the defendant be committed to the custody of the Attorney General for purposes of mental health treatment and to restore his competency. (*Id.*) The defendant was then transferred to the Federal Medical Center in Butner, North Carolina ("FMC Butner"). (Dkt. No. 24 at 2.)

## C. Lucking Forensic Evaluation

This Court received a forensic evaluation by Dr. Robert G. Lucking, a staff psychiatrist at FMC Butner, signed on April 4, 2013 ("Lucking Evaluation"). In his evaluation, Dr. Lucking

diagnosed the defendant with "delusional disorder, paranoid type," and concluded that the defendant is not competent to stand trial. (Lucking Evaluation at 5-6.) He explained that "there are major psychiatric symptoms in the form of paranoid delusional beliefs, which currently prevent him from working with his attorney to plan a legal strategy." (*Id.* at 6.) He further explained that while the defendant "appears to have the ability to engage in a forthright and candid relationship with his attorney," the issues he would discuss are related to his delusional beliefs and as such he would not be able to engage in a "logical, rational, reality based conversation." (*Id.*)

Dr. Lucking reported that the defendant was not treated with any psychotropic medication because he refused to be treated. (*Id.* at 7.) While Dr. Lucking did not believe that the defendant met the criteria for involuntary medication under the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210, 221 (1990) (allowing involuntary administration of antipsychotic medication when defendant (1) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself or others), he did believe the defendant should be involuntarily medicated under the Supreme Court's decision in *Sell v. United States*, 539 U.S. 166, 169 (2003) (allowing involuntary administration of antipsychotic medication to non-dangerous incompetent pretrial detainees when four factors are met). *Id.*

Dr. Lucking then discussed the three antipsychotic medications that can be practically administered involuntarily over a long period of time. (Lucking Evaluation at 8.) They are haloperidol, fluphenazine, and risperidone. (*Id.*) Both haloperidol and fluphenazine are categorized as 1st generation (conventional) antipsychotics, and risperidone is categorized as a 2nd generation (atypical) antipsychotic. (*Id.*) 1st generation antipsychotics and 2nd generation antipsychotics appear to have equal efficacy, but differ mainly in their side effect profile. (*Id.*)

The most prevalent side effects for 1st generation antipsychotics are neurological, and the most prevalent side effects for 2nd generation antipsychotics are metabolic. (*Id.* at 9.)

Dr. Lucking then went on to describe his specific treatment plan for the defendant in this case. (*Id.* at 22.) Because 2nd generation antipsychotics are considered the first medication of choice for psychotic conditions due to their milder side effect profile, he planned to prescribe risperidone. (*Id.*) Dr. Lucking would administer 25 to 50 mg of risperidone to the defendant every two weeks intramuscularly. (*Id.*) In addition to generally having less onerous side effects than 1st generation antipsychotics, Dr. Lucking believes that the 2nd generation antipsychotic risperidone is most appropriate because according to the defendant, he has previously been treated with risperidone, and it appears that he did not suffer any major side effects or adverse reaction. (*Id.*)

Next, in his evaluation, Dr. Lucking addressed each of the *Sell* factors. (Lucking Evaluation at 16.) In regards to the first prong—whether important governmental interests are at stake—he did not give an opinion, reasoning that it was strictly a legal issue. (*Id.*)

In regards to the second prong, he concluded that "antipsychotic medication is substantially likely to render [the defendant] competent to stand trial." (*Id.*) To support this conclusion, Dr. Lucking referenced the large "body of evidence in the psychiatric literature that individuals with active psychotic illness can be restored to competency when treated with antipsychotic medication." (*Id.*) One piece of literature that he discussed was a 2007 article, published in the Journal of the American Academy of Psychiatry and the Law, describing a clinical study performed on 22 defendants diagnosed with delusional disorder, like Mr. Watson, who were involuntarily medicated. *See id.* at 21. After involuntary medical treatment, 17 (77%)

of the 22 defendants suffering from delusional disorder had improved significantly and were considered restored to competency. *See id.*

In regards to the third prong, Dr. Lucking explained that the less intrusive treatments, such as psychotherapy, are unlikely to be effective in restoring the defendant to competency for two reasons. (*Id.* at 21.) First, because the defendant does not believe that he is ill or in need of treatment, he will not engage in any form of psychotherapy. (*Id.* at 22.) And second, while there is evidence in the psychiatric literature that some forms of psychotherapy are beneficial to a patient with psychotic symptoms, this is in addition to treatment with antipsychotic medication. He noted that there is currently no evidence that psychotherapy alone is an effective alternative for treatment with antipsychotic medication. (*Id.*)

In regards to the fourth prong, Dr. Lucking explained that his treatment plan is medically appropriate because defendant has no current medical or physical conditions that would be adversely affected by the risperidone. (*Id.*) Dr. Lucking further explained that in the event that any side effects should arise, they will be treated either by medical management of the specific side effect, or by a change to another medication after it is presented to the Court for approval. (*Id.* at 22-23.) In light of his evaluation, Dr. Lucking requested that this Court issue an order for the involuntary medical treatment of the defendant for the purpose of restoring him to competency as outlined in *Sell.* (*Id.* at 23.)

### D. First *Sell* Hearing

On April 30, 2013, this Court conducted a *Sell* hearing, during which Dr. Lucking was the only testifying witness. (April 30 Hr'g Tr. at 2:3.) This Court recognized Dr. Lucking "as an expert in the diagnosis and treatment of mental health disorders, as well as competency evaluation." (*Id.* at 9:1-6.) During the hearing, Dr. Lucking gave testimony consistent with the

6

findings detailed in his forensic evaluation.[2]  (*See generally* April 30 Hr'g Tr.)  He testified that

he had conducted approximately 10 sessions with the defendant over a four-month period, and

had reviewed the competency evaluation submitted by Dr. Peterson before making his own

competency evaluation.  (April 30 Hr'g Tr. at 10:6-17.)

Dr. Lucking testified that his diagnosis of the defendant is delusional disorder, paranoid

type, as he previously reported in his competency evaluation.  (*Id.* at 11:8-17.)  He explained that

"Mr. Watson believes that he's a member of the Special Air Services of the United Kingdom and

has been sent on special missions which he would not discuss with [Dr. Lucking].  (*Id.* at 12:18-

21.)  He believes that he was inducted or trained for this since the age of seven [by his father]."

(*Id.* at 12:21-22.)

Based upon the information outlined in the forensic evaluation, Dr. Lucking believes that

there is a "substantial possibility that he could be restored to competency with treatment using an

antipsychotic medication."  (*Id.* at 16:2-5.)  This treatment plan consisted of giving Mr. Watson

25 milligrams of risperidone intramuscularly every two weeks.  The medical personnel at FMC

Butner would then "observe for clinical improvement, and if necessary … would increase the

dose as needed anywhere from 37.5 or 50 milligrams, again, depending on his clinical response."

(*Id.* at 16:16-21.)  Dr. Lucking restated his reasons for prescribing risperidone, and explained that

"[t]he fact that [the defendant] had received it before is [only] a fraction of the reason for

choosing that medication."  (*Id.* at 49:22-24.)  He went on to say that he would still recommend

risperidone even if there was no evidence that the defendant had previously taken it because

clinically "this is the best choice for treatment at this point in time for [the defendant]."  (*Id.* at

61:4-6.)

---

[2] The forensic evaluation itself was also entered into evidence at the hearing.  (April 30 Hr'g Tr. at 31:6-13.)

Dr. Lucking testified that during his career he has treated approximately 10 patients with delusional disorder, and believed that all of them were successfully treated with antipsychotic medication. (April 30 Hr'g Tr. at 17:7-14.) The reason he has only treated 10 patients suffering from delusional disorder, he explained, is that generally patients suffering from "delusional disorder function[] well in the community...[and] generally don't come in for treatment." (*Id.* at 13:18-22.) "They usually [only] come into treatment when they come into conflict ... in major areas of their life. They get arrested, such as Mr. Watson." (*Id.* at 13:24-25, 14:1-2.) When asked whether in his expert opinion, in light of the defendant's diagnosis and current health, and anything else that Dr. Lucking considered medically relevant, is it in the defendant's best medical interest to be treated with the treatment plan outlined? Dr. Lucking replied "yes, it is." (*Id.* at 27:13-19.)

At the conclusion of the *Sell* hearing, the Court granted the parties until June 7, 2013 to file any brief they deemed necessary based upon Dr. Lucking's testimony at the *Sell* hearing. The Court also granted the parties until June 19, 2013 to file any opposition brief, and until June 24, 2013 to file any reply brief.[3] (April 30 Hr'g Tr. at 66:2-12.)

### E. Motion to Involuntarily Medicate Defendant

On June 7, 2013, the government filed its Motion to Involuntarily Medicate Defendant to Restore him to Competency. (Dkt. No. 24.) In its motion, the government discussed the preliminary evaluation by Dr. Peterson, the forensic evaluation by Dr. Lucking, and the testimony elicited at the *Sell* hearing. (*Id.*) In summary, the government argued that it has a significant interest in prosecuting this case because it involves serious public safety concerns, but that it cannot pursue this interest if the defendant remains incompetent to stand trial. (Dkt. No. 24 at 16-

---

[3] Defense counsel informed the Court that he would need a transcript of the proceeding to participate in the briefing, and that the production of the transcript would take approximately 30 days. (April 30 Hr'g Tr. at 66:2-12.)

17.) The government further argued that "Dr. Lucking has provided a treatment plan [, outlined in his forensic evaluation,] that is substantially likely to restore the defendant's competency, is the least intrusive means of doing so, and is medically appropriate." (Dkt. No. 24.)

On June 11, 2013, the government filed a supplement to its Motion to Involuntarily Medicate Defendant. (Dkt. No. 25.) In this supplement, the government addressed a Fourth Circuit opinion in *United States v. Chatmon*, 718 F.3d 369 (4th Cir. 2013), issued on June 10, 2013, that impacted the proceedings before this Court. (*Id.*) In *Chatmon*, the court analyzed the third *Sell* factor, the existence of a less intrusive means for restoring a defendant to competency. (*Id.*) The court held that, before ordering that a defendant be involuntarily medicated, "the court 'must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power.'" *Chatmon*, 718 F.3d at 375 (quoting *Sell*, 539 U.S. at 181). In light of *Chatmon*, the government amended the relief that it requested in its June 7, 2013 Motion and now asked that this Court order the defendant to take oral antipsychotic medication as prescribed by Dr. Lucking, or else be held in contempt by this Court. (Dkt. No. 25.)

On July 2, 2013, a hearing was held. (Dkt. No. 33.) Upon consideration of the briefs, supplemental brief, and all argument presented, this Court denied the government's Motion to Involuntarily Medicate Defendant on the basis that there appeared to be a less restrictive alternative, that being voluntary medication. (Dkt. Nos. 24, 34.) The Court ordered the defendant to voluntarily take his medication orally, under the auspices of being held in contempt of Court if he failed to do so. (Dkt. No. 34.) This Court further ordered that the medical personnel at FMC Butner notify both government counsel and defense counsel as to whether the defendant is voluntarily taking his medication. (*Id.*) Lastly, this Court ordered that upon notification of the defendant's failure to voluntarily take his medication orally as directed, this Court would issue

9

an Order or schedule a hearing to reconsider the *Sell* factors for purposes of ordering the defendant to be involuntarily medicated through injection. (*Id.*)

## F.  Second (Continuation of) *Sell* Hearing

On July 9, 2013, this Court received notification from the medical personnel at FMC Butner that on July 5, 2013 the defendant, Mr. Watson, had orally taken two milligrams of risperidone. (July 17 Hr'g Tr. at 4:6-9.) Since that date, however, Mr. Watson had refused to voluntarily take any medication, including the risperidone that was prescribed to him by the medical personnel at FMC Butner. (*Id.* at 4:9-14.) The Court, pursuant to its July 3, 2013 Order, having warned that it may hold the defendant in contempt if he refused to voluntary medicate himself, and having informed the parties that it would then hold a continuation of the first *Sell* hearing in order to determine whether involuntary medication under the new circumstances was now appropriate, decided to hold a second *Sell* hearing. (*Id.* at 4:15-19.)

On July 17, 2013, this Court conducted a continuation of the previous *Sell* hearing regarding the government's Motion to Involuntarily Medicate Defendant to Restore him to Competency. (Dkt. No. 38.) Dr. Lucking and the defendant Mr. Watson testified at the hearing. (July 17 Hr'g Tr. at 2.) Dr. Lucking stated that Mr. Watson had become quite angry about him ordering the medication for him, and had not taken any medication since the first dose. (*See id.* at 5:15-18.) The defendant explained that he discontinued taking the prescribed medication because he suffered from five side effects: (1) "severe extreme stomach pain[,] which was right around the whole midsection, right above [his] legs."[4] (*Id.* at 26:3-5); (2) "heart racing rapidly like it was going to explode." (*Id.* at 26:11-12); (3) drowsiness (*Id.* at 26:16-25); (4) the inability

---

[4] He equated this feeling to what he assumed a woman who was menstruating would feel if she had stomach cramps. (See id. at 33:18-23.)

to work due to "severe pain." (*Id.* at 27:1-4); and (5) the inability to walk without pain. (*Id.* at 27:5-7.)

On redirect examination, Dr. Lucking testified that none of the side effects that the defendant claims that he experienced were side effects of risperidone, except for possibly drowsiness, which can result from significant doses of the medication. (*Id.* at 39-42.) Dr. Lucking explained that a "temporal connection does not mean there's a causal connection." (*Id.* at 39:17-19.) And there are many factors other than the medication that could have caused the side effects, such as anxiety, irritation, anger, or medical conditions. (*See id.* at 40:17-19.) Dr. Lucking informed the Court that he would expect any substantial side effects to be reported to him. (*Id.* at 43:15-16.) He did not, however, expect his nurses to report "every little thing," and would only expect his nurses in passing to tell him if a patient complained of a reaction to a medication, but gave no details. (*Id.* at 27:5-7.) While Mr. Watson stated that he told a nurse the next day about the side effects that he had experienced, he admitted that he did not give any details and only said he "had a reaction to it." (*Id.* at 28:3-4.) He also admitted that the nurses told him to notify the doctor of any side effects, but that he never spoke to Dr. Lucking. (*Id.* at 28:14, 29:4-5.)

Upon consideration of the briefs filed by the parties, arguments presented by counsel, and testimony by Dr. Lucking and the defendant, this Court overturned its earlier ruling and granted the government's Motion to Involuntarily Medicate Defendant to Restore him to Competency. (Dkt. No. 38.) Upon the request of the defendant, this Court ordered that the execution of the Order be stayed for fourteen days so as to give defense counsel an opportunity to explore the possibility of an appeal and to discuss the matter with the defendant. (*Id.*)

### G. <u>Motion to Dismiss for Lack of Jurisdiction</u>

On July 26, 2013, the defendant filed a Motion to Dismiss for Lack of Jurisdiction arguing that the "only way a magistrate judge may ever order forcible medication is if a defendant has only been charged with a misdemeanor."[5] (Dkt. No. 39.) Defense counsel further argued that to order forcible medication in this case, a magistrate judge would have to conclude that a misdemeanor is a "serious crime" under *Sell v. United States*, 539 U.S. 166, 180 (2003), and to defense counsel's knowledge no court has yet concluded that. (*Id.*) Alternatively, defense counsel argued that the undersigned Magistrate Judge lacks jurisdiction to order the forcible medication because such an order is dispositive, and the matter has not yet been referred to the undersigned by a district judge for the issuance of a report and recommendation. (*Id.*) Concurrently, on July 26, 2013, the defendant filed a Motion to Stay the July 18, 2013 Order pending the resolution of the Motion to Dismiss, and this Court granted the Motion to Stay. (Dkt. Nos. 40, 44.)

### H. <u>Appeal</u>

On August 1, 2013, the defendant filed a Notice of Appeal, and the Honorable United States District Judge T.S. Ellis, III was added to the case. (Dkt. No. 45.) The following week, the defendant filed a Motion to Stay Pending Appeal of Magistrate's Ruling, and the Honorable United States District Judge T.S. Ellis, III granted the Motion. (Dkt. Nos. 47-48.)

On August 15, 2013, a grand jury returned an indictment against Mr. Watson. (Dkt. 49.) The indictment charged the defendant with violations of: 18 U.S.C. § 32(a)(1) & (8) (Attempted

---

[5] This was actually a Renewed Motion to Dismiss for Lack of Jurisdiction. Defense counsel had previously filed a Motion to Dismiss for Lack of Jurisdiction on June 19, 2013. However, on July 1, 2013, defense counsel moved to withdraw the motion and this Court granted the request. (Dkt. Nos. 27, 31-32.) Defense counsel explained that "it renew[ed] its challenge here on more narrow grounds." (Dkt. No. 39.)

Destruction of an Aircraft); 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); and 18 U.S.C. § 924(c)(1)(A) (Use of Firearm During Crime of Violence).

On August 21, 2013, this Court vacated its July 18, 2013 Order. Finally, on August 23, 2013, the Honorable United States District Judge T.S. Ellis, III referred the matter to this Court for further proceedings and preparation of a report and recommendation concerning the government's Motion to Involuntarily Medicate Defendant to Restore him to Competency. (Dkt. No. 56.) Judge Ellis directed the parties to seek a schedule from this Court for the submission of supplemental briefs and, upon the Defendant's request, delayed the matter until the end of September to allow the defendant the opportunity to hire an expert and to explore the possibility of the defendant voluntarily medicating himself.

## I.   Hilkey Forensic Evaluation

In accordance with this Court's schedule, the defendant filed its supplemental brief on October 18, 2013. In its brief, the defendant informed the Court that it had retained an expert, Dr. James H. Hilkey, Ph.D., who examined Mr. Watson and provided the Court with a forensic psychological consultation report ("Hilkey Report"). In his report, Dr. Hilkey stated that he had the opportunity to review all the aforementioned reports, transcripts of the two *Sell* hearings, and met with the defendant on four separate occasions over a two and one half week period. (Hilkey Report at 1-3.)

Dr. Hilkey reported that the defendant is "correctly diagnosed with Delusional Disorder, Persecutory Type."[6] Dr. Hilkey strongly encouraged the use of supportive and cognitive behavior psychotherapy, but did not assert that Dr. Lucking's medical treatment plan was medically inappropriate. (*See generally* Hilkey Report). Dr. Hilkey suggested that "any treatment approach

---

[6] Dr. Lucking diagnosed the defendant with "delusional disorder, paranoid type." (Lucking Evaluation at 5-6.) It appears, however, that paranoid type is merely another name for persecutory type.

be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated...because [f]ailure to compassionately address these fears only contributes to fears of persecution." (Hilkey Report at 7.)

### III.   LEGAL STANDARD

The Constitution allows the government to involuntarily medicate a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only in certain rare instances. *Sell*, 539 U.S. at 179-80.  The Supreme Court of the Unites States has established four factors that a court must consider when determining whether involuntary administration of medicine for the purpose of rendering a defendant competent to stand trial is appropriate. *Id.* at 180-81.

"First, a court must find that important governmental interests are at stake." *Id.* at 180. While the government's interest in bringing to trial an individual accused of a serious crime is important, courts, however, must consider the facts of the individual case in evaluating the government's interest in prosecution because circumstances may lessen the importance of that interest. *See id.*

"Second, the court must conclude that involuntary medication will significantly further those concomitant state interests." *Sell*, 539 U.S. at 181.  In other words, the court must find that administration of the drugs is substantially *likely* to render the defendant competent to stand trial and is substantially *unlikely* to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. *See id.*

"Third, the court must conclude that involuntary medication is necessary to further those interests." *Id.*  To reach this conclusion, the court must find that any alternative, less intrusive

treatments are unlikely to achieve substantially the same results. *See id.* Additionally, the court must consider less intrusive means for administering the drugs before considering more intrusive ones. *See id.*

Fourth and finally, "the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. Under this factor, courts must consider the specific medications at issues, and their various side effects and levels of success. *See id.*

## IV.   DISCUSSION

Applying the four factors outlined in *Sell*, the undersigned Magistrate Judge finds at this time that involuntary medication is appropriate and necessary to further the government's important interest of prosecuting the defendant for what the Court has determined is a significant serious offense.

### A.   Important Governmental Interest at Stake

The undersigned Magistrate Judge finds that an important government interest is at stake in the prosecution of the defendant concerning the alleged offenses. Specifically, the undersigned finds that defendant is charged with a "serious crime" and that no "special circumstances so undermine the government's interests in this case." *United States v. White*, 620 F.3d 401, 413 (4th Cir. 2010).

#### *1.   Defendant is charged with a serious crime*

Under the first prong of the *Sell* inquiry, the court must find that the government has an important interest in bringing the defendant to trial. The Supreme Court in *Sell* acknowledged that "the government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180-81. While the Court in *Sell* did not define "serious" for

15

purposes of this determination, the Fourth Circuit has reasoned that it is "appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes." *United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (holding that a "maximum term of imprisonment [of] 10 years—is 'serious' under any reasonable standard"); *United States v. White*, 620 F.3d 401, 411 (4th Cir. 2010) (determining that the crime was serious where the defendant faced multiple counts with maximum penalties of 5 and 10 years).

The defendant was previously only charged with assault and interference with a United States government employee while such employee is engaged in the performance of his official duties under 18 U.S.C. § 111(a)(1), which only carries a maximum penalty of one year imprisonment. On August 15, 2013, however, a grand jury returned an indictment against Mr. Watson and charged him with violations of: 18 U.S.C. § 32(a)(1) & (8) (Attempted Destruction of an Aircraft); 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); and 18 U.S.C. § 924(c)(1)(A) (Use of Firearm During Crime of Violence).

The attempted destruction of an aircraft carries a maximum penalty of 20 years imprisonment. *See* 18 U.S.C. § 32(a)(1) & (8). Being a felon in possession of a firearm carries a maximum penalty of 10 years imprisonment. *See* 18 U.S.C. § 922(g)(1); 924(a)(2). And finally, the use of a firearm during a crime of violence, that is discharged, carries a mandatory *minimum* penalty of 10 years of imprisonment. That mandatory 10 year minimum must be consecutive to any sentence for any other offenses for which the defendant is convicted. 18 U.S.C. § 924(c)(1)(A)(iii). In *Evans*, cited above, the court held that a "maximum term of imprisonment [of] 10 years—is 'serious' under any reasonable standard." In light of this holding, the undersigned has no choice but to find that a crime that carries a *minimum* penalty of 10 years of imprisonment is most definitely a "serious crime."

## 2. *Government interest is not outweighed by special circumstances*

The defendant concedes that based on the indictment he has been charged with a "serious offense," but argues that the government's interest is mitigated by two special circumstances. (Dkt. No. 59 at 3.) The first is that the defendant will most likely be found not guilty by reason of insanity, and the second is that the defendant will likely be further confined under 18 U.S.C. § 4246 if the government's motion to involuntarily medicate is denied.[7] (*Id.* at 4.) In making these arguments, the defendant relies on *United States v. Duncan*, No. 4:11cr112, 2013 WL 4827742 (E.D. Va. July 22, 2013).

In *Duncan*, the defendant was charged with the unlawful possession of a firearm under 18 U.S.C. § 922(g)(8), and diagnosed with Bipolar I Disorder, Severe with Psychotic Features. *Id.* at *1-2. The court found that the combination of four special circumstances sufficiently mitigated the government's interest. *Id.* at *8. Those special circumstances are: (1) the amount of time the Defendant has already spent in federal custody; (2) the likelihood that the Defendant will face significant time in federal custody absent a formal trial and conviction; (3) the likely success of an insanity defense; and (4) the likelihood that the Defendant will be placed on supervised release if convicted of the charge against him. *Id.* Contrary to what the defendant argues, those special circumstances are not present in this case.

As the government correctly notes, the facts in *Duncan* are clearly distinguishable from the facts and circumstances in this case. (Dkt. No. 63 at 3.) It is also worth noting that while the defendant focused his arguments on the second and third special circumstances, in *Duncan*, the court focused primarily on the first special circumstance. "The Court finds that the

---

[7] 18 U.S.C. § 4246(d) states that "[i]f, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which he is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment."

Government's interests have been substantially, if not completely, mitigated by the amount of time the Defendant has already spent in custody and will likely spend in custody prior to trial and sentencing." *Duncan* at *10. The court concluded that the defendant would likely spend more time incarcerated while being restored to competency than he would if sentenced. *Id.* at *10. This is not the situation in this case. In *Duncan*, the defendant's sentence was estimated to be between 15-21 months, and the court estimated that he would likely spend approximately 30 months incarcerated before being restored to competency. *Id.* at *10. Here, Mr. Watson's least serious charge, count three, is substantially similar to the defendant's only charge in *Duncan*. *See id.* at *2. Additionally, the defendant here faces a charge that carries a *minimum* penalty of 10 years of imprisonment (18 U.S.C. § 924(c)(1)(A)), as well as a charge with a statutory maximum penalty of 20 years imprisonment (18 U.S.C. § 32(a)). As the government accurately points out, "even with substantial litigation, the defendant will not spend more time fighting involuntary medication and being restored to competency than he will serve if he is sentenced on all three counts in the indictment," and thus the first special circumstance in *Duncan* is not present. (Dkt. No. 63.)

Regarding the second special circumstance, the possibility that the defendant will be confined if he is not medicated does not substantially diminish the government's interest. In *Sell*, the Supreme Court clarified that "[w]e do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution." While the possibility of civil commitment proceedings under 18 U.S.C. § 4246 does mitigate the government's interest, the question to consider, however, is whether it so substantially mitigates the government's interest so as to deny the government the opportunity to have the defendant restored to competency to face criminal prosecution. (Dkt. No. 63 at 6.) In light of the facts of

this case and the weakness of the defendant's arguments in regards to the other *Duncan* special circumstances, the undersigned finds that the possibility of civil commitment does not sufficiently diminish the government's interest in prosecuting the defendant.

Finally, regarding the third special circumstance, the government's interest in this case is not substantially diminished by the possibility of an affirmative defense of not guilty by reason of insanity. First, if the defendant chooses to raise that defense, he will face the burden of "proving, by clear and convincing evidence, that at the time of the offense, he was unable to appreciate the nature and quality or the wrongfulness of his acts because of severe mental disease or defect." *United States v. Cristobal*, 293 F.3d 134, 144 (4th Cir. 2002). Second, this argument is not supported by *Duncan* because again, the facts are very distinguishable.

In *Duncan*, both the defense experts and the government's experts agreed that the defendant's "mental illness impaired his ability to appreciate the wrongfulness of his conduct at the time of the alleged instant offense." *Id.* at *1. Here, that is not the circumstance. In this case, the defendant has been evaluated by three experts—Dr. Peterson, Dr. Lucking, and Dr. Hilkey. While all three experts agree that the defendant suffers from a mental illness and is not presently competent to stand trial, none has expressed any opinion as to whether the defendant was "unable to appreciate the nature and quality or the wrongfulness of his acts because of a severe mental disease or defect." *Cristobal*, 293 F.3d at 144.

The crux of the defendant's insanity defense argument is that Mr. Watson was unable to appreciate the nature and quality or the wrongfulness of his alleged acts due to his delusional belief that he is a covert operative. (Dkt. No. 59 at 5.) When making this argument, he cites Dr. Peterson's evaluation. Dr. Peterson reported that she addressed the defendant's understanding of whether his actions were legally wrong at the time of the offense: "[Mr. Watson] understands

that the charge is for allegedly assaulting or interfering with United States Government employees. However, Mr. Watson stated that he does not believe he should be charged since he has Diplomatic Immunity due to his status as a covert operative for the United Kingdom." (Dkt. No. 13 at 4.) The defendant argues that this shows that at the time of the alleged offense, he was "unable to appreciate the nature or wrongfulness of his acts because he felt they were legally correct and morally justified due to his delusional beliefs." (Dkt. No. 59 at 5.)

The government argues, and the undersigned magistrate judge agrees, that the fact that the defendant has a delusional belief that he should not be charged for his conduct, because he has diplomatic immunity, does not mean that he did not appreciate the nature and quality of his actions. Rather, the fact that he justifies his alleged criminal conduct with his delusional belief that he is a covert agent indicates that he in fact knows that his actions were wrong, and feels the need to justify them.

In *Duncan,* the court concluded that "the mere fact that a defendant has a potentially successful insanity defense would not totally mitigate the government's important interests." *Id.* at *13. The court noted, however, that "considered with other special circumstances and the fact that the [g]overnment's own experts believe the Defendant lacked the *mens rea* necessary to be convicted of the offense conduct charged," this special circumstance mitigated the government's important interests. *Id.* Here, that is simply not the case. The defendant's argument that his affirmative defense will likely be successful is unsupported by any expert, let alone the government's expert. The mere assertion that the defendant intends to raise an insanity defense is, therefore, not a special circumstance that substantially mitigates the government's important interest in prosecuting the defendant.

In sum, the undersigned Magistrate Judge finds that an important government interest is at stake in the prosecution of the defendant concerning the alleged offenses. Specifically, the undersigned finds that defendant is charged with a "serious crime" and that this interest is not outweighed by any special circumstances.

### B. Involuntary Medication Will Significantly Further Government Interests

The undersigned magistrate judge finds that involuntary medication will significantly further the government's important interest of prosecuting the defendant for the alleged offense. "To show that involuntary medication will 'significantly further' the government's interest under the second prong of *Sell*, the government must establish by clear and convincing evidence that involuntary medication is both (1) 'substantially likely to render the defendant competent to stand trial' and (2) 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense.'" *United States v. Bush*, 585 F.3d, 806, 815 (citing *Sell*, 539 U.S. at 181, 123 S.Ct. 2174; *Evans*, 404 F.3d at 235).

At the *Sell* hearing, this Court recognized Dr. Lucking "as an expert in the diagnosis and treatment of mental health disorders, as well as competency evaluation." (April 30 Hr'g Tr. at 9:1-6.) In both his forensic evaluation and during his testimony, Dr. Lucking concluded that "antipsychotic medication is substantially likely to render [the defendant] competent to stand trial." (Lucking Evaluation at 16.) In support of this conclusion, Dr. Lucking referenced the large "body of evidence in the psychiatric literature that individuals with active psychotic illness can be restored to competency when treated with antipsychotic medication." (*Id.*) In addition to the academic literature, Dr. Lucking testified regarding his 10 other patients with delusional disorder, who he successfully treated with antipsychotic medication. (April 30 Hr'g Tr. at 17:7-14.)

Regarding side effects, Dr. Lucking testified that any side effects of the prescribed medication are unlikely to interfere significantly with the defendant's ability to assist his counsel in his defense. (*See id.* at 26:2-12.) When asked whether any possible side effects would interfere with the defendant's ability to understand court proceedings? Dr. Lucking replied, no, "all of that should be improved because his delusional disorder and delusional beliefs will be decreased as will his thought disorder." (*Id.* at 26:8-12.) Dr. Lucking also explained in his forensic report and in his testimony that in the event that any side effects should arise, they would be treated by either medical management of the specific side effect, or by prescribing an alternative medication after presenting the new treatment plan to the Court. *Id.* at 23.

The defendant attempts to undermine Dr. Lucking's treatment with Dr. Hilkey's forensic evaluation. (Dkt. No. 59 at 8.) However, nothing in Dr. Hilkey's report directly discredits Dr. Lucking's treatment plan. In his report, Dr. Hilkey states that based on a review of a number of alternative antipsychotic medications, he and a forensic psychologist colleague agreed that "pharmacological treatment of Delusional Disorders was less efficacious than with typical psychotic disorders such as Schizophrenia." (Hilkey Report at 5.) He also states that "there is some question about the efficacy of pharmacological treatment with Mr. Watson." (Hilkey Report at 7.) Neither statement, however, contends that Dr. Lucking's treatment plan is not substantially likely to render the defendant competent to stand trial. Dr. Hilkey even acknowledged that while the defendant correctly identified some of the side effects associated with … antipsychotic medications, he "has probably exaggerated the intensity" of them. (Hilkey Report at 7.)

As previously mentioned, while Dr. Hilkey strongly encouraged the use of supportive and cognitive behavior psychotherapy, he never indicated that Dr. Lucking's medical treatment plan

22

was medically inappropriate.  (*See generally* Hilkey Report). Dr. Hilkey merely suggested that "any treatment approach be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated...because [f]ailure to compassionately address these fears only contributes to fears of persecution." (Hilkey Report at 7.) Finally, it appears in his report that Dr. Hilkey is suggesting that supportive treatment be provided *in addition to*, rather than in lieu of, antipsychotic medication.

In light of the undisputed testimony and evidence presented in Dr. Lucking's forensic evaluation and at the *Sell* hearing, as well as the findings in Dr. Hilkey's forensic evaluation, the undersigned finds that Dr. Lucking's treatment plan is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense.

## C. Involuntary Medication Necessary to Further Government Interests

The undersigned magistrate judge also finds that involuntary medication is necessary to further the government's interests. To reach this conclusion, the court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results, and the court must consider less intrusive means for administering the drugs before considering more intrusive ones.

In his opposition to the government's Motion to Involuntarily Medicate the Defendant, the defendant essentially argues that a court order backed by the power of contempt is the least intrusive means available. However, in light of the fact that the defendant has failed to comply with this Court's July 3, 2013 Order to that effect, this option is no longer viable.

Additionally, in his forensic evaluation, Dr. Lucking explained that the less intrusive treatments, such as psychotherapy, are unlikely to be effective in restoring the defendant to

competency for two reasons: first, because the defendant does not believe that he is ill or in need of treatment, he will not engage in any form of psychotherapy; and second, because while there is evidence in the psychiatric literature that some forms of psychotherapy are beneficial to a patient with psychotic symptoms, this is in addition to treatment with antipsychotic medication as there is currently no evidence that psychotherapy alone is an effective alternative for treatment with antipsychotic medication. (*Id.*)

This is not contradicted by Dr. Hilkey's forensic evaluation. While Dr. Hilkey strongly encourages the use of supportive and cognitive behavior psychotherapy, he never contends that Dr. Lucking's medical treatment plan is medically inappropriate. Dr. Hilkey merely suggests that "any treatment approach be it pharmacological or psychological must be offered in a supportive manner designed to mitigate the fears of the individual being treated…because [f]ailure to compassionately address these fears only contributes to fears of persecution." (Hilkey Report at 7.) And finally, as previously mentioned, it appears in his report that Dr. Hilkey is suggesting that supportive treatment be provided *in addition to*, rather than in lieu of antipsychotic medication.

In light of the fact that a court order backed by the power of contempt has previously proven to be unsuccessful, and the fact that psychotherapy is unlikely to be effective in restoring the defendant to competency in this case, the undersigned magistrate judge finds that involuntary medication is necessary to further the government's interests.

### D. Administration of Drugs is Medically Appropriate

The undersigned magistrate judge finds that the proposed medical treatment is medically appropriate. To conclude that the medical treatment is medically appropriate, the Court must consider the patient's best medical interest in light of his medical condition, and consider the specific medications at issues, and their various side effects and levels of success.

At the second *Sell* hearing, as noted earlier, the defendant claims that he discontinued taking the prescribed medication because he suffered from five side effects: (1) "severe extreme stomach pain[,] which was right around the whole midsection, right above [his] legs."[8] (*Id.* at 26:3-5); (2) "heart racing rapidly like it was going to explode." (*Id.* at 26:11-12); (3) drowsiness (*Id.* at 26:16-25); (4) inability to work due to "severe pain." (*Id.* at 27:1-4); and (5) inability to walk with no pain. (*Id.* at 27:5-7.)

Dr. Lucking explained however, that none of the side effects that the defendant claims that he experienced were side effects of risperidone, except for possibly drowsiness, which can result from significant doses of the medication. (*Id.* at 39-42.) Dr. Lucking explained that a "temporal connection does not mean there's a causal connection." (*Id.* at 39:17-19.) And there are many factors other than the medication that could have caused the side effects, such as anxiety, irritation, anger, or medical conditions. (*See id.* at 40:17-19.) The defendant's own expert, Dr. Hilkey, even admitted that while the defendant correctly identified some of the side effects associated with...antipsychotic medications, he "has probably exaggerated the intensity of" them. (Hilkey Report at 7.)

Dr. Lucking believes that the 2nd generation antipsychotic risperidone is most appropriate because it generally has less onerous side effects than 1st generation antipsychotics, and, according to the defendant, he has previously been treated with risperidone, and it appears that he did not suffer any major side effects or adverse reaction. (*Id.*) Dr. Lucking explained, however, that he would still recommend risperidone even if there was no evidence that the defendant had previously taken it because clinically "this is the best choice for treatment at this point in time for [the defendant]." (*Id.* at 61:4-6.)

---

[8] He equated this feeling to what he assumed a woman who was menstruating would feel if she had stomach cramps. (See id. at 33:18-23.)

During his career, Dr. Lucking has treated approximately 10 patients with delusional disorder, and believed that all of them were successfully treated with antipsychotic medication. (April 30 Hr'g Tr. at 17:7-14.)  When asked whether in his expert opinion, in light of the defendant's diagnosis and current health, and anything else that Dr. Lucking considered medically relevant, is it in the defendant's best medical interest to be treated with the treatment plan outlined?  Dr. Lucking replied "yes, it is." (*Id.* at 27:13-19.)  In light of the undisputed testimony and evidence presented in Dr. Lucking's forensic evaluation and at the *Sell* hearing, as well as the findings in Dr. Hilkey's forensic evaluation, the undersigned finds that Dr. Lucking's proposed treatment plan is medically appropriate.

## V.    RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge recommends that the government's Motion to Involuntarily Medicate Defendant to Restore him to Competency be GRANTED.  Accordingly, the undersigned Magistrate Judge recommends that an order be entered ordering the medical personnel at FMC Butner to involuntarily medicate the defendant such that he is rendered competent to stand trial.

## VI.    NOTICE

**By mailing copies of this report and recommendation, the parties are notified as follows.  Objections to this report and recommendation must, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, be filed within fourteen (14) days of service on you of this report and recommendation.  A failure to file timely objections to this report and recommendation waives appellate review of the substance of the report and recommendation and waives appellate review of a judgment based on this report and recommendation.**

The Clerk is directed to send a copy of this Report and Recommendation to counsel of record.

_____ /s/ _____
Ivan D. Davis
United States Magistrate Judge

March 7, 2014
Alexandria, Virginia